IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY GRADY, #143344,     )
                              )
        Plaintiff,         )
                              )
        v.                 )    CIVIL NO. 2:14-cv-991-MHT
                              )
LEEPOSEY DANIELS, et al.,    )
                              )
        Defendants.     )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff Larry Grady ("Grady") brings this action pursuant to 42 U.S.C. § 1983, challenging the conditions of his confinement in the spring of 2014, while he was an inmate at Elmore Correctional Facility ("Elmore") in Elmore, Alabama. Doc. No. 1 at 2. Grady seeks damages, and he demands a jury trial.  Doc. No. 1-5, at 5.  Grady claims Defendants wrongfully denied him two books, and he claims Defendants transferred him and removed him from school in retaliation for exercising his First Amendment right to complain about the denial of the books.[1]  Doc. No. 1 at 2-3.  Defendants are Leeposey Daniels, Althea Jones, and Charles McKee.  Doc. No. 1 at 2; Doc. No. 20.

Pursuant to the orders of this court, Defendants filed an answer, special report, supplemental special report, and evidentiary materials addressing the claims for relief raised in the complaint. In their reports, Defendants assert that there is no merit to Grady's claims, that they are entitled to Eleventh Amendment immunity and qualified

---

[1] The court denied Grady's attempts to add claims, and it denied his request for preliminary injunctive relief.  Doc. Nos. 25, 28, 31.

immunity, that Grady lacks standing to claim damages concerning the books, that Grady cannot recover damages for mental or emotional injury because he does not allege a physical injury, and that Grady did not properly exhaust his available administrative remedies before filing suit regarding the books. Doc. Nos. 19, 20, 34.

The court directed Grady to respond to Defendants' report. Doc. No. 21. The court advised Grady it would in the future treat Defendants' report and Grady's response as a dispositive motion and response. *Id.* at 1-2. The court advised Grady that his response should be supported by affidavits or statements made under penalty of perjury and/or appropriate other evidentiary materials, and it advised him of the proper manner in which to respond to the reports. *Id.* at 3. Grady responded. Doc. No. 27. The court directed Defendants to file a supplemental report; they responded; and Grady also submitted further responses. Doc. Nos. 32, 34, 36, 39, 40.

"[A]n exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'" *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008). Therefore, the court will treat Defendants' report that Grady did not exhaust his administrative remedies regarding the books as a motion to dismiss.[2] The court will treat the remainder of Defendants reports as a motion for summary judgment under Federal Rule of Civil Procedure 56. Upon consideration of this motion and the

---

[2] Defendants do not move to dismiss Grady's retaliation claim based on § 1997e(a), and Daniels indicated "Grady was afforded all due process requirements in accordance with ADOC Administrative Regulation #403." Doc. No. 34-1 at 2. Consequently, the court determines that Grady properly exhausted whatever administrative remedies were available concerning his retaliation claim.

evidentiary materials filed in support thereof, the court concludes that the motion to dismiss with respect to the exhaustion defense is due to be denied, and the motion for summary judgment regarding Grady's retaliation claim is due to be granted in part and denied in part.

## II. EXHAUSTION

### A. Standard of Review

The Prison Litigation Reform Act ("PLRA") compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life," *Porter v. Nussle,* 534 U.S. 516, 532 (2002), "irrespective of the forms of relief sought and offered through administrative remedies," *Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001). Moreover, "the PLRA exhaustion requirement requires *proper* exhaustion." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006) (emphasis added).

> Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings. . . . Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no

longer available] would turn that provision into a largely useless appendage.

*Id.* at 90-91, 93 (footnote omitted, alterations added); *Johnson v. Meadows,* 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016) (rejecting "special circumstances" exception to the exhaustion requirement). The Supreme Court explained that remedies are not "available" when the administrative procedure in practice is a "dead end," when the procedure is so opaque that "no ordinary prisoner can discern or navigate it," or when administrators thwart inmates from using it "through machinations, misrepresentation, or intimidation." *Id.* at 1859-60. "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry,* 491 F. App'x 81, 83 (11th Cir. 2012).

Exhaustion under the PLRA is a "threshold matter" that must be addressed before considering the merits of the case and cannot be waived. *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004); *Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11th Cir. 1998) (exhaustion not waivable). "When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. 'If in that light,

the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.'" *Myles v. Miami-Dade County Corr. & Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant*, 530 F.3d at 1373-74)). "If the complaint is not subject to dismissal at this step, then the court should make 'specific findings in order to resolve the disputed factual issues related to exhaustion.'" *Myles*, 476 F. App'x at 366 (quoting *Turner* 541 F.3d at 1082 (citing *Bryant*, 530 F.3d at 1373-74, 1376)); *see also Bryant*, 530 F.3d at 1376 (exhaustion factual dispute is for the judge, not jury). The judge may "consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." *Bryant*, 530 F.3d at 1376 (footnotes and citations omitted).

## B. Discussion

Elmore provides an administrative procedure for staff to review incoming mail and for inmates to appeal decisions to reject mail. Defs.' Ex. H, Doc. No. 20-8. Under Alabama Department of Corrections ("ADOC") Administrative Regulation Number 448 ("AR 448"),[3] inmates can receive and send mail "unless there is a reasonable suspicion that such correspondence may present a threat to the safety and security of the facility, public, staff, or inmates. *Id.* at 3. "Incoming mail may be considered as a threat to institutional security if it includes, but is not limited to . . . [i]nciting violence based on

---

[3] Defendants provided a copy of AR 448 and other prison records but have not submitted a certificate of authenticity from a records custodian or other qualified witness. Nevertheless, Grady does not challenge the authenticity of the records, and they are treated as authentic. *See O'Connor v. Carnahan*, No. 3:09CV224/WS/EMT, 2015 WL 6405976, at *5 (N.D. Fla. Sept. 21, 2015) (ruling that prison records' authenticity could not reasonably be challenged under Fed. R. Evid. 902(11) or Fed. R. Evid. 803(6)), *report and recommendation adopted*, 2015 WL 6182680 (N.D. Fla. Oct. 21, 2015).

race, religion, sex, creed, or nationality, or disobedience toward law enforcement officials or correctional staff . . . obscene photographs, pictures, or drawings, including publications and advertisements from distributors. . . ." *Id.* at 7. When mail is rejected, the regulations require the mail clerk to send an inmate a Notification of Rejected Mail, Form 448. *Id.* at 7. The prison uses the top portion of Form 448 to notify the inmate the mail is rejected, the reason for the rejection, and it informs the inmate that he has 72 hours to appeal the rejection to the warden or designee. *Id.* at 7, 12. Form 448 also informs the inmate that he has 30 days to return the mail to the sender at the inmate's expense or the mail will be destroyed. *Id.* The inmate uses the middle portion of Form 448 to appeal the rejection to the warden and state the reason for the appeal. *Id.* at 12. The bottom portion of Form 448 provides places to indicate whether the appeal is denied or upheld and authorized signatures for the decision. *Id.* Under AR 448 § V(H)(6), if an inmate appeals a ban, "the Warden shall furnish a copy of the documentation on the matter to the Commissioner/designee. This documentation will include copies of pages of the excluded issue that contain material that has been identified as violating the restrictions." *Id.* at 9.

Defendants all aver that Grady did receive books at Elmore directly from Books-A-Million that Grady's wife ordered for him. Daniels Aff., Doc. No. 20-1 at 1; McKee Aff., Doc. No. 20-2 at 1; Jones Aff., Doc. No. 20-3 at 1. The two books were entitled *Hitting the Bricks an Urban Erotic Tale* and *Thug a Licious*. Doc. No. 20-9. After Grady received the books, they were reviewed, and it was determined the language was

objectionable. According to Daniels, "the material contained explicit and graphic material." Doc. No. 20-1 at 1. According to McKee, "the books contained graphic and obscene language." Doc. No. 20-2 at 1. According to Jones, the "language was obscene, graphic, and violent." Doc. No. 20-3 at 1. McKee and Jones state that Grady did not receive a Notification of Rejected Mail because after he was informed the books were objectionable, Grady chose either to return the books to the sender or to mail the books home at his own expense. Doc. No. 20-2 at 1; Doc No. 20-3 at 1. Defendants argue that AR "448 provides for an inmate to appeal a decision that certain reading materials are not allowed" and Grady "never appealed the Warden's decision." Doc. No. 20 at 15.

Grady asserts that Defendants did not comply with AR 448 § V(H)(6), which requires the Warden to document the objectionable pages for the Commissioner or designee. Grady Aff., Doc. No. 27 at 2. Grady further avers that he asked Jones, McKee, and Daniels to show him where in the books there was explicit and graphic material, but they did not. Grady Aff., Doc. No. 36 at 4.

The requirement for the Warden to document the objectionable pages is for the benefit of the Commissioner, not the inmate. Doc. No. 20-8 at 9. Thus, Defendants' failure to comply with that rule does not affect an inmate's ability to exhaust administrative remedies. Defendants argue that Grady failed to exhaust his administrative remedies because he could have but did not appeal the warden's decision to deny him the books. Defendants admit they did not give Grady a Notification of Rejected Mail— which includes the appeal form—because they delivered the books and confiscated them

after Grady received them.  Doc. Nos. 20-1, 20-2, 20-3.  Thus, this court concludes, prison officials prevented Grady from exhausting administrative remedies by not providing him the appeal form.  *E.g.*, *Ross*, 136 S. Ct. at 1859-60 (holding that administrative remedies are not "available" when administrators thwart inmates from using it "through machinations, misrepresentation, or intimidation").  Moreover, even assuming such action does not constitute interference under *Ross*, Defendants submitted to this court a partial letter that Grady wrote to the Alabama Department of Corrections Commissioner, indicating that Grady did appeal to the warden before he filed suit.  Doc. No. 20-4 at 5.  According to the partial "Administrative Complaint" dated July 17, 2014, that Defendants attached to their report, Grady recounted that he "went through the proper chain-of-command to complain with the Shift Supervisors, the Captain to the Warden, and eventually to" the Commissioner.  *Id.*  Grady wrote that "upon my lodging my complaint with this Commissioner's Office, I was arbitrarily removed from J. F. Ingram Technical College and transferred to another prison facility . . . ."  Doc. No. 20-4 at 5.  Consequently, based on the materials Defendants submitted, Grady exhausted whatever administrative remedies were "available" before filing suit, and Defendants' motion to dismiss under 42 U.S.C. § 1997e(a) is due to be denied.

## III. STANDING

Defendants argue that Grady has no standing to complain about damages concerning the return of books because it was Grady's wife, not Grady, who was unable to get a refund for the rejected books, and Grady eventually received copies of the books

8

after he was transferred to Bibb. Consequently, they argue, Grady suffered no injury, and "any conceivable injury is not actual or imminent." Doc. No. 20 at 12.

The Constitution limits the jurisdiction of federal courts to "cases" and "controversies," and the doctrine of standing is "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (citing *Lujan*, 504 U.S. at 560 n.1; other citations omitted). To be concrete, the injury "must actually exist" in a real and not abstract way, though the injury need not be "tangible." *Id.* at 1548-49 (citations omitted).

Grady has standing to sue for the loss of his books connected to his First Amendment claim. Grady's injury includes the loss of his property, that is, the books he received and that were taken from him while he was at Elmore. Just because they were gifts to him does not lesson their value or his interest in them. Defendants' request to dismiss Grady's claim concerning the books based on standing is therefore due to be denied.

## IV. LIMITATION ON RECOVERY

Defendants argue that Grady does not allege he suffered a physical injury and therefore his recovery is limited by the PLRA, which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act . . . ." 42 U.S.C. § 1997e(e). Doc. No. 20 at 15. In *Williams v. Brown*, 347 F. App'x 429, 436 (11th Cir. 2009), an inmate raised a claim of retaliatory transfer. The Eleventh Circuit Court of Appeals held that § 1997e(e) requires compensatory damages available under § 1983 be for "more than a de minimis physical injury." *Id.* The Court of Appeals added, however, that "'[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.'" *Williams*, 347 F. App'x at 436 (quoting *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003)). The Court of Appeals remanded the case for the district court to consider whether the inmate's complaint could be liberally construed to include a request for nominal damages. *Id.* at 436-37.

Here, Grady's requested relief is as follows: "Cause Defendants to reimburse funds, and award for deliberately violations of rights, amount to be later determined otherwise for actual, punitive, and compensatory." Doc. No. 1 at 4. Grady's request for compensatory damages for the loss of property is unaffected by § 1997e(e). *See Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002) ("We also do not perceive any

basis in Section 1997e(e) for barring an award of compensatory damages for the loss of Thompson's property provided he can establish actual injury.") (citation omitted). Grady's request for actual, punitive, and compensatory damages regarding his retaliatory transfer claim is due to be dismissed because he does not allege more than a de minimis physical injury. *See Williams*, 347 F. App'x at 436. The court also determines, however, that Grady's pro se complaint should be construed liberally to include a request for nominal damages. Grady requests no particular monetary amount, but he asks for an "amount to be later determined otherwise." Doc. No. 1 at 4. Like the pro se plaintiff in *Williams*, Grady did not explicitly request nominal damages. Nevertheless, on remand the district court in *Williams* determined the inmate impliedly requested it. *Williams v. Brown*, No. CV607-045, 2009 WL 4906861, at *2 (S.D. Ga. Oct. 20, 2009) ("given the extraordinary lengths to which the *Williams* panel went here (it decided what another panel called an open question in this circuit), this Court concludes that Williams 'Rule 54(c)-impliedly pled,' and thus seeks here, nominal damages"); *see also id*. (quoting *Harris v. Whitehead*, No. CIV.A. 2:04CV485-MHT-WC, 2007 WL 2300964, at *10 (M.D. Ala. Aug. 8, 2007) (recommendation adopted) ("In light of Harris' failure to prove compensatory damages, the Court finds that Harris is entitled to nominal damages in the amount of $1.00 from Whitehead and Spann, even though Harris did not specifically request nominal damages.")). Thus, this court also treats the complaint to include a request for nominal damages. The court now turns to the question whether summary judgment is due to be granted on Grady's claims.

# V. SUMMARY JUDGMENT

## A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations added). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Grady to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case

exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court considers facts pled in a plaintiff's sworn complaint when considering his opposition to summary judgment"). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material

facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Grady fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against Defendants McKee and Jones. As for Defendant Daniels, Grady does demonstrate a genuine dispute of material fact that precludes summary judgment on Grady's retaliation claim. *See Matsushita*, 475 U.S. at 587.

### B. Summary of Material Facts

The court incorporates the facts previously set out regarding the exhaustion issue. During the time relevant to the complaint, Grady was an inmate at Elmore, Daniels was Warden at Elmore, McKee was a Correctional Captain at Elmore, and Jones was a Correctional Officer at Elmore. Doc. No. 20-1, 20-2, 20-3.

On April 29, 2014, Grady was informed of his acceptance to Ingram State Technical College for the electrical program, and classes were set to begin May 6, 2014, at Draper Correctional Center ("Draper"). Doc. No. 20-6. Grady was looking forward to the education. He states he worked hard to qualify for it and waited ten years to meet the criteria to participate. Doc. No. 20-4 at 1. He saw it "as a means of subsistence or support" and an important step for his reintegration into society upon his release. *Id.* Grady is serving a life sentence. Doc. No. 20-5.

During the spring of 2014, Grady received from the publisher, Books-A-Million, two books his wife ordered for him, entitled *Thug a Licious* and *Hittin the Bricks An Urban Erotic Tale*. Doc. No. 1 at 3; Doc. No. 20-9. After Grady received the books, they were taken from him because they contained objectionable material. Doc. No. 20-1 at 1; Doc. No. 20-2 at 1; Doc. No. 20-3 at 1. Grady was told to either send the material home with a family member or mail them home. Doc. No. 20-1 at 1. Grady mailed them home. *Id.* Because of the delay in returning them, Grady's wife was unable to recover the cost of the books. Doc. No. 36 at 5. After his transfer to Bibb County Correctional Facility ("Bibb"), Grady received and was allowed to keep the same books from Books-A-Million that he could not have at Elmore. Doc. No. 20-9.

While at Elmore, Grady complained about the decision to take the books. Doc. No. 1 at 3; Doc. No. 20-4 at 2. Grady asked officers to show him the explicit and graphic material in the books. Doc. No. 36 at 4. Grady states that Daniels "told Grady he was trying to be smart." *Id.* Grady states that Daniels then got Grady's original complaint,

read it to Grady, and "told him if anybody come or call him or try to talk to him, he would not be in his camp." Doc. No. 36 at 4. According to a complaint Grady sent prison officials, Daniels said "'that if anyone comes to talk to me concerning this complaint, you will not remain in my camp.'" Doc. No. 20-4 at 2.

Grady's discussion with Daniels occurred on Thursday, May 8, 2014. Doc. No. 36 at 4. On Monday, May 12, 2014, after Grady returned from school, he was told to pack up because he was being transferred. *Id.* Grady was transferred to Bibb on May 12, 2014. Doc. No. 20-7 at 1. Daniels denies that that Grady was transferred in retaliation. Doc. No. 20-1 at 2. Daniels states "Grady was transferred to another facility due to a Warden to Warden transfer. Inmate Grady was not the only inmate selected to be transferred at that time." *Id.* McKee denies that Grady was transferred out of retaliation and states Grady's transfer "was merely to accommodate another Institution request for a Warden to Warden Transfer. Inmate Grady was not the only inmate selected for this transfer." Doc. No. 20-2 at 1-2. The record does not include any other evidence that McKee was involved in the decision to transfer Grady. Jones states she was not involved in the decision to transfer Grady. Doc. No. 20-3.

Daniels filed a supplemental affidavit stating Grady was transferred "due to the fact that he sought relief because he feared he would be harassed by the staff at Elmore Correctional Facility because he had filed complaints against the staff at Elmore Correctional Facility." Doc. No. 34-1 at 1-2. Daniels attached to his affidavit an unsigned "Social Service Action" dated May 12, 2014, indicating the reason for the transfer was

"request to transfer inmate Gibson [sic] to Bibb on a transfer to Bibb per Warden Daniels. Inmate Grady is seeking relief not to be harassed by Elmore staff for filing a complaint against Elmore staff. . . ." Doc. No. 34-1 at 3 (all caps removed). Grady states he never told Daniels he was afraid of being harassed by officers and instead told Daniels that if he was harassed by the officers, then Grady would hold Daniels responsible. Doc. No. 36 at 5.

After his transfer, Grady filed an administrative complaint indicating he complained about the books to the shift supervisors, captain, warden, and after submitting a complaint to the Commissioner's Office, he was transferred to Bibb, where he had no vocational opportunities. Doc. No. 36 at 5. Grady states that if Daniels "was trying to do the right thing, he would have sent Grady to Staton or Draper because that is where Grady was in trade school." Doc. No. 36 at 5.

### C. Official Capacity

To the extent Grady sues Defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst State School & Hospital v. Halderman*,

465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, Defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.

### D. Qualified Immunity

Defendants argue they are entitled to qualified immunity, which offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citations omitted) (alteration added). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that defendants were acting within the course and scope of their discretionary authority when the incidents complained of occurred. Grady must, therefore, allege facts that, when read in a light most favorable to

him, show that defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). If Grady cannot establish both elements to satisfy his burden, then Defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### C. Books

Grady claims Defendants refused to let him have the books, *Hittin the Bricks An Urban Erotic Tale* and *Thug a Licious*, in violation of Grady's First Amendment rights. "In the First Amendment context, . . . some rights are simply inconsistent with the status

of a prisoner or 'with the legitimate penological objectives of the corrections system.'"

*Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Courts are "sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  Courts "afford[] considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Id.* at 408.  Thus, prison regulations that impinge on an inmate's First Amendment rights must be "reasonably related to legitimate penological interests," and in making that determination, courts consider and balance the four factors set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see Thornburgh*, 490 U.S. at 413 (*Turner* reasonableness test applies to publications sent to an inmate).  The four factors are: (1) "whether the regulation has a valid, rational connection to a legitimate governmental interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources; and" (4) "whether there are ready alternatives to the regulation."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quotation marks omitted, citing *Turner*, 482 U.S. at 89-91).  In addition to having a rational relation to a legitimate governmental interest, the regulation must be neutral. *Turner*, 482 U.S. at 89.  A "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner*

factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard). "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132.

Applying *Turner*, the record in this case demonstrates that Defendants' refusal to allow Plaintiff to have *Thug a Licious* and *Hittin the Bricks*, pursuant to AR 448, was reasonably related to a legitimate penological interest. First, there is a rational relationship between the policy and a legitimate government interest in maintaining the security and orderly running of the institution. While it would have been helpful for Defendants to provide more clarification of institutional security and safety reasons for the rule and the rejection of the two books, it is apparent from the record that the books were rejected as sexually explicit and violent. According to Defendants, the books were confiscated because they included "explicit and graphic material," "graphic and obscene language," and the "language was obscene, graphic, and violent." Doc. Nos. 20-1, 20-2, 20-3. Grady asked Elmore prison officials to show him what language in the books was objectionable.[4] Doc. No. 36 at 4. But in this § 1983 action Grady does not provide the

---

[4] Grady states prison officials failed to comply with the procedures in AR 448, which require them to document which pages of a publication violate the restrictions. Doc. No. 27 at 2. Grady does not specifically raise a due process argument, and such a claim would be meritless. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available"); Ala. Code § 41-9-60 *et seq* (State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for redress for the loss of property).

materials; he does not describe them; and he does not suggest the books were not as Defendants assessed them to be except to say that he was allowed to have them at another institution. Doc. No. 1; Doc. No. 27; Doc. No. 36. Defendants' rejection of the books bears a rational connection to legitimate prison interests in safety, security, and orderly running of the prison. *E.g.*, *West v. Gordy*, No. 2:13-CV-808-WHA-TFM, 2017 WL 814037, at *7 (M.D. Ala. Feb. 7, 2017) ("ADOC's policy of excluding publications that contain nude photographs is expressly aimed at maintaining security, rehabilitating inmates and reducing sexual harassment of female staff members") (citing cases), *report and recommendation adopted*, 2017 WL 812465 (M.D. Ala. Mar. 1, 2017); *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) ("The relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy— sexual harassment of female officers, jail security and rehabilitation of inmates—is clear."). In addition, the rule is neutral. *See Thornburgh*, 490 U.S. at 415-416 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*.").

Second, viewed "expansively," *see Thornburgh*, 490 U.S. at 417, the right at issue here is Grady's First Amendment right to receive and read a range of publications so that he is not "shut . . . out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect." *King v. Federal Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005). The alternatives need not be ideal so long as they are available. *Overton*,

539 U.S. at 134.  Here, there is no suggestion that Grady was prevented from receiving other publications, and "there are alternative means of expressing the right that remain open to" him.  *Turner*, 482 U.S. at 90.

Third, the presence of the two books in the prison creates the same risks present in *Turner* and *Thornburgh*, that is, "the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned."  *Thornburgh*, 490 U.S. at 418.  When an inmate can exercise rights "'only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' the courts should defer to the 'informed discretion of correctional officials.'"  *Id.* (quoting *Turner*, 482 U.S. at 90, 92).

Fourth, Grady has not identified, as he must, "ready alternatives" to the regulation that demonstrate the regulation is an exaggerated response to the prison's concerns.  *Turner*, 482 U.S. at 90-91. To show that the regulation is an exaggerated response, the inmate must point to an easier, less-restrictive alternative that fully accommodates the inmate's right "at de minimis cost to valid penological interests."  *Id.* at 91.  While the books were allowed at another institution, this court gives broad deference to prison administrators who face different safety and penological concerns at different institutions, and who are in a better position than this court to "regulate the relations between prisoners and the outside world."  *Thornburgh*, 490 U.S. at 408.  Consequently, this court cannot say the Elmore officials' confiscation of the books constituted an exaggerated response to the problem of maintaining security and safety at Elmore.  Defendants are

entitled to judgment as a matter of law on Grady's free speech claim regarding his incoming books.

Even if Defendants' actions constitute a violation of the First Amendment, they are entitled to qualified immunity against Grady's claim for damages related to the books because Defendants' actions did not violate clearly established federal law. It bears repeating that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 565 U.S. at 546 (quotation marks and citations omitted). When Defendants refused to let Grady have the books *Thug a Licious* or *Hittin the Bricks*, it was not clearly established that doing so would violate Grady's First Amendment rights. *Cf. Prison Legal News v. Livingston*, 683 F.3d 201, 221 (5th Cir. 2012) ("Concluding that it is inconsistent to allow *The Shawshank Redemption* while excluding *Prison Masculinities* requires a subjective assessment of each book rather than a simple matching of the books' ISBN codes. These are precisely the types of subjective assessments that usually fall within prison administrators' discretion."). The particularized contours of Grady's First Amendment right to have the books would not have been clear to a reasonable official, therefore Defendants are entitled to qualified immunity. *See Reichle*, 132 S. Ct. at 2093. Summary judgment is due to be granted in favor of Defendants on Grady's First Amendment claim regarding the books.

## D. Retaliation

Grady asserts that he was transferred to another institution without access to schooling in retaliation for complaining about the confiscated books. Although McKee states Grady was not transferred out of retaliation, the record does not indicate McKee or Jones were personally involved in the decision to transfer Grady. Consequently, the retaliation claim against McKee and Jones is due to be dismissed. The court addresses Grady's retaliation claim only as to Daniels.

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (quotation marks and citation omitted).

> For an inmate to prevail on a retaliatory transfer claim, he must establish that (1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct. Once the plaintiff establishes that the protected conduct was a motivating factor behind the harm, the burden of production shifts to the defendant. The defendant can prevail on summary judgment if it can show it would have taken the same action in the absence of the protected activity.

*Smith v. Florida Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013) (citations omitted). Grady meets all three elements of the test. First, Grady was exercising his First Amendment right of free speech when he complained to Daniels about the conditions of Grady's confinement, that is, the confiscation of his books. *See Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) ("It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his

confinement.") (citations omitted).  Second, Grady's transfer to another institution and accompanying removal from school "would likely deter a person of ordinary firmness from engaging in such speech," therefore Daniels' actions adversely affected the protected conduct. *Mosley*, 532 F.3d at 1276 (describing second requirement to establish retaliation claim); *Williams*, 347 F. App'x at 435 ("While an inmate does not have a constitutionally protected liberty interest against being transferred to a less agreeable prison, prison officials may not transfer an inmate in retaliation for exercising his right to file grievances against prison officials.") (citations omitted). Third, a jury could infer from Daniels's remark to Grady on Thursday, May 8, 2014, that "if anyone comes to talk to me concerning this complaint, you will not remain in my camp," and Daniels's transfer of Grady on the following Monday, May 12, 2014, that Grady's transfer was prompted by his complaints. Doc. No. 20-4 at 2.

Under the burden-shifting analysis, Daniels is entitled to summary judgment if he can show he would have taken the same action in the absence of Grady's protected activity. *See Smith*, 713 F.3d at 1063.  Daniels does not meet his burden. Daniels initially stated that Grady was transferred "due to a Warden to Warden transfer. Inmate Grady was not the only inmate selected to be transferred at that time." Doc. No. 20-1 at 2.  The record includes no explanation of what a "Warden to Warden transfer" is.  After prompting from the court, Doc. No. 32, Daniels then stated Grady was transferred to Bibb "due to the fact that he sought relief because he feared he would be harassed by the staff at Elmore Correctional Facility because he had filed complaints against the staff at

Elmore Correctional Facility." Doc. No. 34-1 at 1-2. The "Social Service Action" attached to Daniels's affidavit states, "request to transfer inmate Gibson [sic] to Bibb on a transfer to Bibb per Warden Daniels. Inmate Grady is seeking rel[ie]f to not be harassed by Elmore staff for filing a complaint against Elmore staff." Doc. No. 34-1 at 3. Daniels does not explain what a "Social Service Action" is. The second reason Daniels gave for the transfer appears to conflict with the first, and the reason could be interpreted either as an act of retaliation or concern. Grady avers he did tell Daniels "that if something like that happen Grady would hold him responsible," but Grady states that if Daniels "was trying to do the right thing, he would have sent Grady to Staton or Draper because that is where Grady was in trade school." Doc. No. 36 at 5. A reasonable jury could conclude Daniels acted out of retaliation instead of concern for Grady's safety and that Daniels would not have transferred Grady to Bibb in the absence of Grady's complaints. It is unclear on this record what Daniels asserts is the proper reason for Grady's transfer, and there is a genuine question whether, but for Daniels's retaliatory motive, the transfer would not have occurred. *See O'Bryant*, 637 F.3d at 1215 (discussing the causation requirement); *Bibbs v. Early*, 541 F.3d 267, 274 (5th Cir. 2008) ("Resolving the factual controversies 'in favor of the nonmoving party,' we are not persuaded that Defendants were entitled to summary judgment on the alternative basis that Bibbs failed to adduce sufficient evidence in support of causation.") (footnotes omitted).

It was beyond debate at the time of Grady's transfer that prisoners have a First Amendment right to be free from a retaliatory transfer. *See Williams*, 347 F. App'x at

435 (retaliatory transfer to less agreeable prison for exercising right to file grievances violates the First Amendment) (citing *Bridges v. Russell*, 757 F.2d 1155, 1157 (11th Cir. 1985) and *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989)). Consequently, Daniels is not entitled to qualified immunity on Grady's First Amendment retaliation claim. *See Crosby*, 394 F.3d at 1332.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' motion to dismiss Grady's claim regarding denial of books based on his failure to properly exhaust administrative remedies or based on standing be DENIED.

2. Defendants' motion for summary judgment regarding claims against them in their official capacities be GRANTED.

3. Defendants' motion for summary judgment regarding Grady's claim about the books be GRANTED.

4. Defendants McKee's and Jones's motion for summary judgment regarding Grady's retaliatory transfer claim be GRANTED.

5. Defendants McKee and Jones be DISMISSED.

6. Defendant Daniels's motion for summary judgment regarding Grady's retaliatory transfer claim against him in his individual capacity be DENIED.

It is further

ORDERED that on or before **July 6, 2017** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 20th day of June, 2017.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE